René P. Voss (CA Bar # 255758)
Email: renepvoss@gmail.com
15 Alderney Road
San Anselmo, CA 94960
Phone: (415) 446-9027; Fax: (267) 316-3414
LEAD COUNSEL

Douglas P. Carstens (CA Bar # 193439)
E-mail: dpc@cbcearthlaw.com
Michelle Black (CA Bar # 261962)
E-mail: mnb@cbcearthlaw.com
CHATTEN-BROWN, CARSTENS & MINTEER, LLC
2200 Pacific Coast Highway, Ste. 318
Hermosa Beach, CA 90254
Tel: (310) 798-2400; Fax: (310) 798-2402
LOCAL COUNSEL

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| MOUNTAIN COMMUNITIES FOR FIRE SAFETY; LOS PADRES FORESTWATCH; and EARTH ISLAND INSTITUTE, <br><br> Plaintiffs, <br><br> v. <br><br> KEVIN ELLIOTT, in his official capacity as the Forest Supervisor of the Los Padres National Forest and the UNITED STATES FOREST SERVICE, <br><br> Defendants. | Case No.: 2:19-cv-6539 <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*) |

**INTRODUCTION**

1.      This is a civil action for declaratory and injunctive relief challenging Federal Defendants' (the Forest Service's) actions related to the 1,200-acre Cuddy Valley Forest Health/Fuel Reduction Project (Cuddy Valley Project), which includes mechanical thinning by commercial logging of up to 601 acres of Jeffrey pine and pinyon-juniper forest in the Los Padres National Forest.

2.      Plaintiffs seek a declaration that the Forest Service has violated the National Environmental Policy Act (NEPA) and the National Forest Management Act (NFMA) by proceeding with the Cuddy Valley Project without the necessary environmental analysis, an order setting aside the Cuddy Valley Project decision, and, if necessary, an injunction to avert harms from logging and other project activities on sensitive resources and values in the Cuddy Valley Project area.

3.      The Forest Service has violated NEPA by authorizing a commercial timber sale project using a categorical exclusion (CE) on up to 601 acres, greatly exceeding the 70- and 250-acre limits for CEs of this type, and instead must prepare at least an Environmental Assessment (EA).

4.      Moreover, the Forest Service has failed to consider or analyze significant factors regarding the degree to which the effects from logging or thinning on the quality of the human environment are likely to be highly controversial and the degree to which the proposed action is likely to affect public health or safety.  Thinning is highly controversial because there is a significant scientific dispute as to the efficacy of thinning to reduce wildfire risk, and instead there is substantial evidence that thinning will actually make matters worse by increasing fire risk, which, in turn, implicates the potential that these effects will have significant effects on public health and safety.

5.      Plaintiffs have also submitted evidence that the Forest Service has greatly overstated the density of trees and the need to reduce this tree density.  The Forest Service has erroneously included very small trees (between 1-4 inches in

diameter) in their calculations of current stand densities, whereas the study of historical stand densities to which they compare current densities excluded these small trees from the data.  Applying the methodology from the study of historical data shows that the Cuddy Valley Project area already meets tree density objectives, which likely obviates the need to reduce the density of larger trees and the need for the project.  The Forest Service, however, has failed to respond to Plaintiffs proffered information, in violation of NEPA's requirement to ensure scientific accuracy and integrity in its analyses.

6.     The Forest Service has also relied on an old Community Wildfire Protection Plan to suggest the public supports its project, whereas the old community plan proposes a substantially smaller and less intensive project to achieve wildfire risk reduction goals.  Instead, the over 600 comments from the public have universally opposed any thinning or logging in the area.

7.     Finally, the project is located in the Mt. Pinos Place Management Area, in which the Los Padres Forest Plan requires the Forest Service to maintain the area as a naturally evolving and naturally appearing landscape with big (old growth) trees, a natural appearing backdrop to rural communities, and a rustic mountain-built environment, with high scenic integrity.  But the Forest Service has violated the Forest Plan by failing to explain how logging a substantial percentage of the trees, without diameter limits, would maintain these Forest Plan standards, in violation of the NFMA.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 5 U.S.C. §§ 701 et seq. (Administrative Procedure Act) and 28 U.S.C. §§ 2201 and 2202 (Declaratory Judgment Act).  Plaintiffs have exhausted all administrative remedies and the violations of law claimed below are ripe for judicial review.

9.     Venue lies in the Central District of California, pursuant to 28 U.S.C. § 1391(e), because one of the Plaintiffs, Los Padres ForestWatch, is located in the District.  Moreover, Defendants reside within the District; the project was approved by the Forest Supervisor, whose U.S. Forest Service office is located within the District.

10.    An actual judiciable controversy exists between the parties hereto.

**INTRADISTRICT VENUE**

11.    Similarly, because a substantial part of the events or omissions, which give rise to the claims herein occurred in Santa Barbara County, assignment to the Western Division of this Court is proper under General Order No. 349.

**PARTIES**

12.    Plaintiff MOUNTAIN COMMUNITIES FOR FIRE SAFETY (MCFS) are residents of Mt. Pinos communities, including Lebec, Frazier Park, Lake of the Woods, Cuddy Valley, Pinon Pines and Pine Mountain Club.  MCFS members are engaged members of these community with a mission to preserve and protect their community, which is embraced by the Los Padres National Forest. MCSF's goal is to protect and nurture the forest and their homes, simultaneously seeking informed alternatives.  MCSF works to ensure that homeowners in the area are equipped with the information they need to protect their properties from wildfire.  The organization supports science-based approaches to protecting their local communities from wildfire, such as reducing the ignitability of existing structures, creating smart defensible space around homes, reducing new development in dangerous areas, and improving early warning and evacuation systems.  As part of this work, MCSF regularly engages with local agencies to ensure that the needs and goals of community protection are being considered, responded to, and met using the best available science.

13.    MCFS's members include individuals who believe the forest is their community and they care deeply for its inhabitants, flora and fauna, including

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF          4

endangered species working their way to sustainability.  MCFS stays informed and helps others access the best information available to stay safe and protect their forest.

14.    Plaintiff LOS PADRES FORESTWATCH (LPFW) is a non-profit, 501(c)(3) corporation headquartered in Santa Barbara, California. The organization's mission is to protect and restore public lands throughout the Central Coast region through policy and legal advocacy, scientific collaboration, and community outreach. ForestWatch focuses its work throughout the Los Padres National Forest and nearby public lands. To further its mission and protect the interests of its members and supporters in preserving public lands, ForestWatch monitors forest conditions and activities in the Los Padres National Forest and reviews and comments on proposed Forest Service projects. ForestWatch also organizes habitat restoration and forest stewardship projects using crews of volunteers, making the forest a better place for all to enjoy and visit. In addition, ForestWatch programs seek to engage underserved youth by providing them with opportunities to explore nature and foster an appreciation of the outdoors.

15.    LPFW's members include individuals who regularly use public lands within the Los Padres National Forest, including the Cuddy Valley Project areas proposed for logging, for scientific study, recreational enjoyment, aesthetic beauty, and nature photography.  These members' interests will be irreparably harmed by the planned logging, as they will no longer be able to take nature photographs of the area in its pre-logging state, or enjoy the aesthetic beauty of the unlogged forest habitat and its inhabitants.

16.    Plaintiff EARTH ISLAND INSTITUTE (EII) is a nonprofit corporation organized under the laws of the State of California.  EII is headquartered in Berkeley, California.  EII's mission is to develop and support projects that counteract threats to the biological and cultural diversity that sustains the environment.  Through education and activism, these projects promote the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    5

conservation, preservation and restoration of the earth. One of these projects is the John Muir Project (JMP)—whose mission is to protect all federal public forestlands from commercial exploitation that undermines and compromises science-based ecological management. JMP's offices are in San Bernardino County, California. EII is a membership organization with over 15,000 members in the U.S., over 3,000 of whom use and enjoy the National Forests of California for recreational, educational, aesthetic, spiritual, and other purposes. EII through JMP has a longstanding interest in protection of national forests. JMP and EII members actively participate in governmental decision-making processes with respect to national forest lands in California and rely on information provided through the NEPA processes to increase the effectiveness of their participation. JMP and EII members include individuals who regularly use and continue to use public lands within the Los Padres National Forest, including the exact tracts of lands in the Cuddy Valley Project area proposed for logging, in particular, for scientific study, recreational enjoyment, aesthetic beauty, and nature photography. These members' interests will be irreparably harmed by the planned logging, as they will no longer be able to scientifically study these areas in their pre-logging state, take nature photographs of the area in its pre-logging state, or enjoy the aesthetic beauty of the unlogged forest habitat and its inhabitants.

17.     This suit is brought by MCFS, LPFW, and EII/JMP on behalf of themselves and their adversely affected members and staff. Plaintiffs and their members' present and future interests in and use of the Cuddy Valley Project area are and will be directly and adversely affected by the agency's impending actions. Those adverse effects include, but are not limited to: (1) public safety hazards from increased wildfire risks associated with the project, (2) impacts to native plants and wildlife and their habitats within and around the Project areas from logging; (3) reduction and impairment of recreation opportunities; (4) impaired aesthetic value of forest lands, trails, and landscapes caused by Defendants' logging; and (5) loss

of scientific study and viewing opportunities with regard to wildlife in areas proposed for logging. In addition, Plaintiffs and their members and staff have an interest in ensuring that Defendants comply with all applicable laws, regulations, and procedures pertaining to the management of national forest lands.

18.     The Forest Service's implementation of the Cuddy Valley Project is in contravention of NEPA and NFMA. Because Defendants' actions approving the Project violate the law, a favorable decision by this Court will redress the actual and imminent injuries to Plaintiffs. To comply with NEPA, the Forest Service would prepare Environmental Assessments (EAs) or Environmental Impact Statements (EISs) to consider the significant effects from these projects, given the potential for significant effects on public health or safety and the fact that the effects on the quality of the human environment are highly controversial. The analysis would consider alternatives, including non-commercial alternatives to the proposed action, which would minimize or avert the harm to Plaintiffs' members caused by the logging of trees and destruction of wildlife habitat and other resources by the proposed actions. To comply with NFMA, the Forest Service would need to analyze whether or not the proposed actions comply with Forest Plan standards for high scenic integrity and how it is consistent with the Mt. Pinos Place Area values for old growth and maintaining a naturally appearing landscape.

19.     Defendant KEVIN ELLIOTT is sued in his official capacity as the Forest Supervisor of the Los Padres National Forest of the United States Forest Service. Supervisor Elliott is directly responsible for forest management in the Los Padres National Forest and for ensuring that all resource management decisions comply with applicable laws and regulations. The Forest Supervisor signed the decision for the Cuddy Valley Project challenged here.

20.     Defendant UNITED STATES FOREST SERVICE is a federal government agency within the Department of Agriculture, which holds the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    7

National Forests in trust for the American people and is responsible for actions in the Cuddy Valley Project area.

## FACTS

The Cuddy Valley Area, Project, and Decision

21.   Cuddy Valley is located about 12 miles west of Interstate 5, Exit 205—the Frazier Mountain Park Road exit.

22.   The Cuddy Valley Project area is located on the western and southern sides of Cuddy Valley in the Mt. Pinos Ranger District in an area designated as the Mt. Pinos Place Management Area of the Los Padres National Forest.  The project area is located adjacent to a remote mountain community called Pinon Pines Estates and to the west of the community of Lake of the Woods, another small mountain community surrounded by the national forest.

23.   The Los Padres Land and Resources Management Plan (or Forest Plan) states that the "Desired Condition" of the Mt. Pinos Place Management Area is that the area is maintained as a naturally evolving and naturally appearing landscape that functions as a big tree (old growth) recreation environment.  It states that the valued landscape attributes to be preserved over time are the big tree (old growth) Jeffrey pine forested areas, the natural appearing backdrop to rural communities, and the rustic mountain-built environment.  In this Management Area, Forest Service managers are expected to focus on perpetuating healthy conifer forests that are one of the main attractions for national forest visitors.  Managers are also expected to main the big tree (old growth) appearance of the Jeffrey pine forests with vegetative treatments that address stand densification issues.  Consistent with these values, the Cuddy Valley area is designated on the Forest Plan Scenic Integrity Objectives Map to meet a standard of high scenic integrity.

24.   The Forest Plan defines "Old Growth" as "Old forests, which often contain several canopy layers, variety in tree sizes, species, decadent old trees, and

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    8

standing and dead woody material." Forest Plan standards require that thinning of these forests favor retention of large-diameter trees.

25.     The 1,200 acre Cuddy Valley Project area is composed of 409 acres of sagebrush scrub, which transitions into 791 acres of pinyon-juniper woodlands mixed with montane conifer forest of Jeffrey pine, as the forest extends up the lower slopes of Mount Pinos.

26.     The Cuddy Valley Project includes a type of commercial logging known as mechanical thinning on up to 601 acres of pinyon-juniper woodlands and Jeffrey pine forest, which the Forest Service intends to implement using a commercial timber sale.

27.     In a recent management decision in the Mt. Pinos Place Management Area—the 2012 Frazier Mountain Project—the Forest Service responded to the public's concerns about the use of commercial logging by choosing an alternative with a ten-inch diameter limit for the removal of trees, implementing the project without a timber sale. Moreover, the Frazier Mountain Project, which is similar to the Cuddy Valley Project, was analyzed more rigorously under NEPA in an Environmental Assessment and included both commercial and non-commercial alternatives. There, the Forest Service determined it could meet its goals of wildfire risk reduction without a commercial timber sale.

28.     Despite the Mt. Pinos Management Area's goal to maintain the area's big tree (old growth) appearance, the Cuddy Valley Project allows tree removal without a diameter limit and by means of a timber sale, overriding the public's ongoing concerns about adverse impacts from commercial logging on wildlife, visual quality, or scenic resources.

29.     Trees would be removed throughout all diameter classes and would include the removal of large commercial trees. While the project proposes to retain some of the larger Jeffrey pines, the project places no diameter limits on Jeffrey pine removal, so even the largest and oldest Jeffrey pines are at risk of removal,

and the project does not prohibit the removal of old growth pinyon pines or junipers.

30.     The project decision does not state how it is consistent with the Mt. Pinos Place Management Area's desired conditions to maintain the area's big tree (old growth) appearance or how the area will be maintained as a naturally evolving and naturally appearing landscape.

31.     Finally, the project decision does not state how visual impacts from the removal of trees (including large and old-growth trees) and shrubs will allow the Forest Service to meet the Forest Plan's visual quality objectives and its standard of high scenic integrity, when instead the project will substantially degrade scenic integrity.

The Mt. Pinos Community Wildfire Protection Plan

32.     In its decision, the Forest Service asserts that it has been working with local individuals and groups via efforts such as the Mt. Pinos Communities Wildfire Protection Plan (CWPP) to establish priorities.  The CWPP was created by the Mt. Pinos Communities Fire Safe Council.  The Council, however, was disbanded and stopped meeting many years before the Forest Service sent out its scoping notice for the Cuddy Valley Project.

33.     The CWPP does include a proposal that overlaps the Cuddy Valley Project area—the *Organizational Camps Project* (OCP).  That proposal, however, included treatments of a much smaller scale than the Cuddy Valley Project and with substantially less intensive thinning.  The OCP's proposed size is 700 acres and would reduce basal area of plantations to about 100 sq. ft. (per acre) and reduce tree densities, leaving about 200 trees per acre.  Stands of natural-occurring Jeffrey pine/pinyon pine/white fir would only be thinned to about 100-140 sq. ft of basal area, leaving all trees larger than 30 inches.  The OCP proposal included only 25 acres of sagebrush treatments.  These proposed actions were deemed sufficient to protect the communities from wildfire risks.

34.     By contrast, the Forest Service's Cuddy Valley Project is substantially larger and more intense.  At 1,200 acres, it includes up to 791 acres of thinning in Jeffrey pine/pinyon pine forest (including up to 601 acres of mechanical thinning) and the removal of 409 acres of sagebrush scrub.  It would reduce stand densities down to 60-100 sq. ft. basal area, leaving only 93 trees per acre, and it does not include a diameter limit on the removal of larger trees.

35.     Since the Cuddy Valley Project substantially exceeds the size and intensity of the CWPP's OCP proposal, it is therefore inconsistent with a proposal reached in agreement with members of the local communities.  Moreover, the Forest Service's assertion that it worked with members of the community to craft the Cuddy Valley Project by referring to the CWPP is disingenuous, misleading, or outright false.  Instead, the public overwhelmingly opposes the proposed logging.

36.     The likely reason for the larger size and intensity of the Cuddy Valley Project is to offer more and larger trees for sale so the project is more attractive to commercial logging interests.

Minimal Public Involvement and Failure to Address the Public's Concerns

37.     On March 13, 2018, the Forest Service sent out a short scoping letter and project summary seeking comments on the proposed Cuddy Valley Project. This was the only comment period for this controversial project.

38.     On April 19, 2018, Plaintiffs LPFW and JMP submitted highly critical and very specific comments with regard concerns about using a categorical exclusion (CE) instead of a more rigorous Environmental Assessment (EA) for a commercial timber sale project.  They documented that recent projects of similar size, such as the Frazier Mountain Project, had been analyzed using an EA, asserting that Forest Service regulations allow the use of a CE for these types of small timber sales only for those projects which are 70 or 250 acres and smaller. LPFW and JMP also pointed out several significant issues and concerns, including the highly controversial nature of the efficacy of this type of project to reduce

wildfire risks and the potential for adverse effects on public health and safety by increasing fire risk.

39.     In addition, the Forest Service received over 600 comments from the public during the public scoping period, with the vast majority requesting additional opportunities for public input and that the Forest Service not conduct any commercial logging.

40.     Despite the many concerns expressed by the Plaintiffs and others, on November 13, 2018, Forest Supervisor Kevin Elliott issued a decision memorandum (DM), excluding the Cuddy Valley Project from a detailed NEPA analysis in an EA or EIS, and allowed the project to move forward as a commercial timber sale without any further public comment opportunities.

41.     The Forest Service in its DM, or otherwise, has not responded in writing to most of the specific concerns raised by the Plaintiffs or the public.

The Highly Controversial Nature of Thinning and Public Health and Safety

42.     In their comments, LPFW and JMP explained the significant scientific controversies regarding the efficacy of thinning to reduce wildfire risks, which implicate the potential significant effects from the project on public health and safety.

43.     As their comments explained, there is substantial scientific evidence that thinning can make the fuel hazard worse instead of better.  Plaintiffs' comments provided references to numerous scientific publications and government reports, which describe the problems and concerns with thinning and the potential for increased wildfire risk to communities.

44.     Regarding the controversial scientific dispute, Plaintiffs pointed to a General Accounting Office report prepared of Congress, which stated, "We do not presume that there is a broad scientific consensus surrounding appropriate methods or techniques for dealing with fuel build-up or agreement on the size of areas

where, and the time frames when, such methods or techniques should be applied." US GAO RCED-99-65.1999:56.

45.     As Plaintiffs' comments explained, thinning can alter the heating of the understory and subsequently reduce moisture levels.  Thinning opens stands to greater solar radiation and wind movement, resulting in warmer temperatures and drier fuels throughout the fire season.  This openness can encourage a wildland fire to spread faster.  Opening up closed forests through selective logging can accelerate the spread of fire through them, and this is especially true when larger, mature trees are removed.[1]

46.     One scientific study found that thinned areas predominantly burned at high severity, while unthinned areas burned predominantly at low and moderate severity.  That is, combined mortality was higher in thinned than in unthinned units.  The study suggests that mechanical thinning may have effectively lowered the fire weather threshold necessary for high severity fire occurrence.

47.     Rather than address the significant and highly controversial concerns about the efficacy of thinning to reduce wildfire risk or the risk to public health and safety raised by these comments, neither the Cuddy Valley Project decision nor the Fire/Fuels Report addressed or discussed the concerns raised by Plaintiffs' comments.  This is not surprising, given that the Fire/Fuels Report posted on the Forest Service website, dated 12/13/2017 and updated on 02/06/2018, was prepared before the Forest Service even accepted public scoping comments.  Nor did the Forest Service respond to scientific information submitted by Plaintiffs, demonstrating that the most effective way to protect homes from wildland fire is to

---

[1] This is precisely what occurred in the deadly 2018 Camp Fire, which rapidly burned through the community of Paradise and caused the loss of 85 lives in Northern California.  This wind-driven fire raced through areas that had been previously thinned or logged before it encountered the community (see https://www.buzzfeednews.com/article/peteraldhous/logging-forest-california-wildfires, Nov. 20, 2018, last visited July 19, 2019)

inform and assist homeowners in making their homes more fire-safe and conducting defensible space pruning of vegetation (which does not involve removal of mature trees) within 100 feet of homes.

48.     Ironically, while the Cuddy Valley Project is advanced by the Forest Service as a means to help protect adjacent communities and structures, it fails to discuss the potential for these significant effects on public health and safety implicated by the highly controversial nature of thinning for wildfire risk reduction, which may instead increase wildfire risk and significantly affect public health and safety.

Overstating the Need for Thinning to Reduce Density

49.     Even though requested during the comment period, the Forest Service did not provide LPFW and JMP with a full set of the stand exam data for the Cuddy Valley Project area until after the scoping comment deadline had passed.

50.     After finally receiving stand exam data of existing conditions in the Cuddy Valley Project area, on December 13, 2018, Dr. Chad Hanson of Plaintiff JMP submitted a supplemental letter in which he explained to the Forest Service that it had greatly overstated current average stand densities of 480 trees per acre based on the inclusion of trees between 1-4 inches in diameter, whereas the historical studies relied on by the Forest Service did not include these small trees, as well as the Forest Service's inclusion of tree species that were not included in the historical study, such as pinyon pine and oak.

51.     Based on Dr. Hanson's calculations, current average stand densities using the Forest Service's own stand exam data—without inclusion of these 1-4 inch trees or tree species excluded from the historical study—is currently 83 trees per acre.  This average tree density is already below the project's proposed stand density reduction goal of 93 trees per acre.  This finding obviates the need to thin trees to historic densities, or obviates the need to thin trees greater than 1-4 inches in diameter to reduce wildfire risks and achieve its tree density goals.

52.    The Forest Service has never responded to Dr. Hanson's supplemental letter, and has otherwise failed to explain or correct its current stand density assertions or erroneous calculations.

Forest Service Sensitive Mammal Species

53.    The Cuddy Valley Project area contains habitat for Forest Service sensitive mammal species, including the Tehachapi white-eared pocket mouse, which is considered a "species of special concern" due to its rarity and may be threatened with extinction according to the California Department of Fish & Wildlife

54.    Forest Service sensitive species are defined as plant and animal species identified by a Regional Forester for which population viability is a concern as evidenced by significant current or predicted downward trend in numbers or density.

55.    The analysis erroneously states that the project will not impact the Tehachapi pocket mouse because this species has not been documented within the project area.  Instead, as Plaintiffs pointed out, the California Natural Diversity Database (CNDDB) lists at least one occurrence of the pocket mouse in the project area.  Moreover, as Plaintiffs pointed out, the CNDDB shows several hundred acres of "predicted habitat" for the pocket mouse in the project area.

56.    A 2012 statement by the Forest Service states that impacts to the pocket mouse from logging projects were "likely" and "especially important" for such species with limited distributions.  And a California Department of Fish and Wildlife report from 1998 concluded that the Forest Service should conduct surveys of the pocket mouse and make adjustments to its land management activities given the limited distribution of the species.

57.    But the Forest Service has never conducted formal surveys for the Tehachapi white-eared pocket mouse.  Moreover, its "no effect" determination

based on its erroneous assertion that it has not been documented in the project area cannot be supported by any other facts in the record.

## APPLICABLE LAW

The National Environmental Policy Act

58.     Congress enacted the National Environmental Policy Act "[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation."  42 U.S.C. § 4321.

59.     To accomplish these purposes, NEPA requires all agencies of the federal government to prepare a "detailed statement" that discusses the environmental impacts of, and reasonable alternatives to, all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  This statement is commonly known as an environmental impact statement ("EIS").  The EIS must describe the adverse environmental effects of the proposed action and alternatives to the proposed action.  *Id.*

60.     NEPA also requires that "all agencies of the Federal Government shall … study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources…."  42 U.S.C. § 4332(E); NEPA Section 102(2)(E); *see* 40 C.F.R. § 1507.2(d) ("This requirement of section 102(2)(E) extends to all such proposals, not just the more limited scope of section 102(2)(C)(iii) where the discussion of alternatives is confined to impact statements.").

61.     The Council on Environmental Quality (CEQ) has promulgated regulations implementing NEPA, which are binding on all federal agencies.  40 C.F.R. § 1507.1.  The CEQ regulations establish additional requirements for

environmental impact statements (EISs) and other requirements of NEPA.  40 C.F.R. § 1508.9.  To further the purposes of NEPA, the Forest Service has also promulgated its own NEPA regulations, *see* 36 C.F.R. § 220 *et seq.*, which are binding upon the agency.

62.    To determine whether a proposed action significantly affects the environment, the agency must consider both the context and intensity of the proposed action, including whether the project will take place in "ecologically critical areas," whether it will affect endangered or sensitive species, whether the effects of the project are highly controversial or uncertain, and whether the project implicates public health or safety.  40 C.F.R. § 1508.27.  In making its determinations, NEPA requires that the agency use the best available data and ensure the scientific integrity, disclose opposing scientific viewpoints, and follow specified procedures to address gaps in data and scientific uncertainty.  40 C.F.R. §§ 1500.1, 1502.9, 1502.22, 1502.24.

63.    To determine whether a proposed action significantly affects the environment, and whether an EIS is required, the acting agency may first prepare an Environmental Assessment (EA).  40 C.F.R. § 1508.9.  An EA must provide sufficient evidence and analysis to determine whether to prepare an EIS.  *Id.*  If the agency concludes that a project may have significant impacts on the environment, it must prepare an EIS.  40 C.F.R. § 1501.4.  If the EA concludes that there are no significant impacts to the environment, the federal agency must provide a detailed statement of reasons why the project's impacts are insignificant and issue a "finding of no significant impact" (FONSI).  40 C.F.R § 1508.13.

64.    Certain proposed actions are considered "categorically excluded" from detailed NEPA analysis and do not require preparation of an EIS or an EA. *Id.* § 1508.4.  The Forest Service has promulgated numerous categorical exclusions, which require a project or case file and decision memo to satisfy NEPA.  *See* 36 C.F.R. § 220.6(e).  In promulgating its CEs, the Forest Service has

acknowledged that "only routine actions that have no extraordinary circumstances should be within categories for exclusion."  57 Fed. Reg. 43,180 (Sept. 18, 1992).[2]

65.     The four relevant categorical exclusions in this case are:

(6)     Timber stand and/or wildlife habitat improvement activities that do not include the use of herbicides or do not require more than 1 mile of low standard road construction. Examples include, but are not limited to:

   (i)     Girdling trees to create snags;

   (ii)    Thinning or brush control to improve growth or to reduce fire hazard including the opening of an existing road to a dense timber stand;

   (iii)   Prescribed burning to control understory hardwoods in stands of southern pine; and

   (iv)    Prescribed burning to reduce natural fuel build-up and improve plant vigor.

36 CFR 220.6(e)(6);

(12)    Harvest of live trees not to exceed 70 acres, requiring no more than 1⁄2 mile of temporary road construction. Do not use this category for even-aged regeneration harvest or vegetation type conversion. The proposed action may include incidental removal of trees for landings, skid trails, and road clearing. Examples include, but are not limited to:

---

[2] *See* at 73 Fed. Reg. 43,084, 43,091 (July 24, 2008) (final rule placing CE rules from the Forest Service Handbook (FSH) to the CFR, explaining that "[t]his final rule is moving established categories and language on extraordinary circumstances from the Forest Service NEPA procedures previously located in FSH 1909.15 to 36 CFR 220.6. These categories and requirements were established following public review and comment, in consultation with CEQ and with CEQ's concurrence. The final rule does not add any new categories, nor does it substantively alter existing requirements regarding extraordinary circumstances.").

     (i)     Removal of individual trees for sawlogs, specialty products, or fuelwood, and

     (ii)    Commercial thinning of overstocked stands to achieve the desired stocking level to increase health and vigor.

36 CFR 220.6(e)(12);

    (13)   Salvage of dead and/or dying trees not to exceed 250 acres, requiring no more than 1⁄2 mile of temporary road construction. The proposed action may include incidental removal of live or dead trees for landings, skid trails, and road clearing. Examples include, but are not limited to:

     (i)     Harvest of a portion of a stand damaged by a wind or ice event and construction of a short temporary road to access the damaged trees, and

     (ii)    Harvest of fire-damaged trees.

36 C.F.R. §§ 220.6(e)(13); and

    (14)   Commercial and non-commercial sanitation harvest of trees to control insects or disease not to exceed 250 acres, requiring no more than 1⁄2 mile of temporary road construction, including removal of infested/infected trees and adjacent live uninfested/uninfected trees as determined necessary to control the spread of insects or disease. The proposed action may include incidental removal of live or dead trees for landings, skid trails, and road clearing. Examples include, but are not limited to:

     (i)     Felling and harvest of trees infested with southern pine beetles and immediately adjacent uninfested trees to control expanding spot infestations, and

     (ii)    Removal and/or destruction of infested trees affected by a new exotic insect or disease, such as emerald ash borer,

Asian long horned beetle, and sudden oak death

pathogen.

36 C.F.R. §§ 220.6(e)(14).

66.    "Scoping is required for all Forest Service proposed actions, including those that would appear to be categorically excluded from further analysis and documentation in an EA or an EIS."  36 C.F.R. § 220.4(e)(1).

67.    If, based on scoping, the responsible official determines that "it is uncertain whether [a] proposed action may have a significant effect on the environment," an EA should be prepared.  36 C.F.R. § 220.6(c).  If, based on scoping, the responsible official determines "that the proposed action may have a significant environmental effect," an EIS should be prepared. *Id.*

68.    Federal agencies are also required to "provide for extraordinary circumstances," which are circumstances "in which a normally excluded action may have a significant environmental impact."  40 C.F.R. § 1508.4.  To comply with NEPA when evaluating a particular project for categorical exclusion, an agency must first determine whether the proposed action falls within a categorical exclusion and then determine whether "extraordinary circumstances" exist that would prevent application of the exclusion.  *Id.*

69.    In providing for "extraordinary circumstances" sufficient to preclude use of its categorical exclusions, the Forest Service has determined that:

Resource considerations that *should* be considered in determining whether extraordinary circumstances related to a proposed action warrant further analysis and documentation in an EA or an EIS [including]: (i) Federally listed threatened or endangered species or designated critical habitat, species proposed for Federal listing or proposed critical habitat, or Forest Service sensitive species;….

36 C.F.R. § 220.6(b)(1) (emphasis added).

70.     Moreover, in considering extraordinary circumstances, the Forest Service must look beyond the list of resource conditions:

> The extraordinary circumstances requirements include a list of resource conditions that "should" be considered. "Should" is used instead of "shall" because "should" underscores that the list is not intended to be exhaustive. The list of resource conditions is intended as a starting place and does not preclude consideration of other factors or conditions by the responsible official with the potential for significant environmental effects.

73 Fed. Reg. 43084, 43091 (July 24, 2008) (rule for 36 C.F.R. § 220 *et seq.*)

71.     NEPA regulations include several significance factors applicable to this case:  "The following should be considered in evaluating intensity:  … The degree to which the proposed action affects public health or safety. … [and] The degree to which the effects on the quality of the human environment are likely to be highly controversial."  40 C.F.R. § 1509.27(b)

72.     "When an agency decides to proceed with an action in the absence of an EA or EIS, the agency must adequately explain its decision."  *Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999).  If the agency asserts that an activity will have an insignificant effect on the environment, the agency " 'must supply a convincing statement of reasons why potential effects are insignificant.' "  *Id*. (quoting *The Steamboaters v. FERC*, 759 F.2d 1382, 1393 (9th Cir. 1985)).

73.     A federal agency must consider and evaluate "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1)(ii).

//

//

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF            21

1   The National Forest Management Act (NFMA)

2        74.    NFMA requires that all "[r]esource plans and permits, contracts, and

3   other instruments for the use and occupancy of National Forest System lands shall

4   be consistent with the land management plans."  16 U.S.C. § 1604(i).  "[A]ll

5   management activities undertaken by the Forest Service must comply with the

6   forest plan, which in turn must comply with [NFMA]…." *Idaho Sporting*

7   *Congress v. Rittenhouse,* 305 F.3d 957, 962 (9th Cir. 2002).

8        75.    Moreover, the Forest Service's NFMA regulations require that:

9   Every project and activity must be consistent with the applicable plan

10   components. A project or activity approval document must describe

11   how the project or activity is consistent with applicable plan

12   components developed or revised in conformance with this part by

13   meeting the following criteria:

14       (1)  Goals, desired conditions, and objectives. The project or

15            activity contributes to the maintenance or attainment of one or

16            more goals, desired conditions, or objectives, or does not

17            foreclose the opportunity to maintain or achieve any goals,

18            desired conditions, or objectives, over the long term.

19       (2)  Standards. The project or activity complies with applicable

20            standards.

21       (3)  Guidelines. The project or activity:

22          (i)  Complies with applicable guidelines as set out in the plan;

23             or

24          (ii)  Is designed in a way that is as effective in achieving the

25             purpose of the applicable guidelines (§ 219.7(e)(1)(iv)).

26   36 C.F.R. § 219.15(d)(1) – (3).

27   //

28   //

1

**CLAIMS FOR RELIEF**

2

**National Environmental Policy Act (NEPA) Violations**

3

76.    The paragraphs above are incorporated herein by reference.

4

Exceeding CE Limits for Commercial Timber Sales

5

77.    Under NEPA, federal agencies must prepare a detailed written

6

statement known as an environmental impact statement (EIS) for "major Federal

7

actions significantly affecting the quality of the human environment." 42 U.S.C. §

8

4332(C); 40 C.F.R. § 1508.11.

9

78.    Unless the action is categorically excluded, an agency must prepare an

10

environmental assessment (EA) to determine whether preparation of an EIS is

11

necessary.  40 C.F.R. § 1501.4(a)-(c).

12

79.    The Cuddy Valley Project is a timber sale project that involves

13

thinning, which would harvest trees from up to 601 acres.  As such, the Project

14

greatly exceeds the 70 acre limitation of the small thinning categorical exclusion

15

(CE) in 36 C.F.R. § 220.6(e)(12), and also exceeds the 250 acre limitations of the

16

timber salvage and sanitation CEs in 36 C.F.R. §§ 220.6(e)(13) and (14).

17

Therefore, the Forest Service was required to prepare an EA or EIS.  In similar

18

wildfire protection projects, such as in the Frazier Mountain Project, the Los

19

Padres National Forest has prepared an EA.  Here, however, the Forest Service

20

decided to limit its NEPA analysis by inappropriately choosing the "timber stand

21

and/or wildlife habitat improvement activities" CE (36 C.F.R. § 220.6(e)(6)),

22

which does not fit the type of commercial logging activities proposed in the Cuddy

23

Valley Project.  The Forest Service's failure to prepare an EA for a commercial

24

timber sale to implement this project violates its own regulations and NEPA.

25

Failure to Consider Potential Significant Effects and Extraordinary Circumstances

26

80.    To comply with NEPA, the Forest Service must adequately consider

27

"[t]he degree to which the effects on the quality of the human environment are

28

likely to be highly controversial" and "[t]he degree to which the proposed action affects public health or safety."  40 C.F.R. § 1509.27(b).

81.     Plaintiffs have presented substantial scientific evidence that thinning can increase wildfire risk and make matters worse instead of better by referencing numerous scientific publications and government reports, which describe concerns with thinning and the potential for increased wildfire risk.

82.     Rather than address the significant and highly controversial concerns about the efficacy of thinning to reduce wildfire risk raised by Plaintiffs' comments, neither the Cuddy Valley Project decision nor the Fire/Fuels Report (dated before scoping began) addressed the concerns raised by Plaintiffs.

83.     While the Cuddy Valley Project has been promoted by the Forest Service as a means to help protect adjacent communities from wildfire risk, it fails to discuss the controversy or the likely potential that these significant effects may have on public health and safety, as implicated by the highly controversial nature of thinning for wildfire risk reduction, and the findings that thinning may instead increase wildfire risk and therefore adversely affect public health and safety.

84.     At the very least, if the Forest Service decides to proceed with an action in the absence of an EA or EIS, it must adequately explain its decision and must supply a convincing statement of reasons why potential effects are insignificant.  *Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999).  Here, the Forest Service has failed to do so.

85.     Moreover, extraordinary circumstances preclude the use of categorical exclusions if a project is likely to adversely affect a Forest Service sensitive species.  36 C.F.R. § 220.6(b)(1).

86.     With respect to the Tehachapi pocket mouse, a sensitive species, the Forest Service has failed to adequately consider or explain the effects on this species because it erroneously stated that it did not occur in the project area, making a "no effect" determination due to erroneous assertion of its absence,

whereas Plaintiffs specifically presented information that the Tehachapi pocket mouse has been observed in the Cuddy Valley Project area and there are hundreds of acres of habitat within the project area.

Failure to Ensure Scientific Accuracy and Integrity

87.   A federal agency must consider and evaluate "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1)(ii).

88.   Dr. Chad Hanson of Plaintiff JMP submitted a supplemental letter to the Forest Service presenting significant new information that would obviate the need to do much of the proposed thinning or density reduction proposed in the Cuddy Valley Project.  In his letter, he explained that the Forest Service had greatly overstated current average stand densities of 480 trees per acre based by including 1-4 inch diameter trees in its calculations, whereas the studies of historical data relied on by the Forest Service did not include these small trees. Further, Dr. Hanson notes that the historical study excluded several tree species (species of trees that are not valuable for commercial logging as lumber), but the Forest Service here included those tree species to calculate stand densities.

89.   NEPA requires that the Forest Service ensure scientific accuracy and integrity in NEPA documents, and must also clearly divulge its methodologies for key findings, and present hard data upon which those findings are based.  40 C.F.R. § 1502.24.

90.   The Forest Service failed to comply with these provision of NEPA by failing to consider and respond to this significant new information, and it violates NEPA because the analysis (a) greatly overstates current average stand densities of 480 trees per acre based on the inclusion of trees between 1-4 inches in diameter and non-timber tree species, whereas the historical studies relied on by the Forest

Service did not include these trees to determine stand densities; (b) makes erroneous comparisons between current and historic stand densities; (c) fails to divulge the methodology it used to assess current stand density (i.e., the inclusion of all trees between 1-4 inches in diameter and non-timber tree species) in comparison to historic density (which did not include these trees); and (d) fails to correct the analysis or re-analyze whether density reduction is still necessary or should be reduced or limited to only very small diameter trees.

91.    By its various violations of NEPA, Defendants have taken final agency actions that are arbitrary, capricious, and otherwise not in accordance with law, or without observance of procedure required by law, within the meaning of the Administrative Procedure Act.  5 U.S.C. § 706(2).  As such, the Court should hold Defendants' actions as unlawful and set them aside.  *Id.*

### National Forest Management Act (NFMA) Violations

92.    The paragraphs above are incorporated herein by reference.

93.    Defendants have authorized the Cuddy Valley Project in violation of the Los Padres Land and Resources Management Plan (the Forest Plan or land management plan).  NFMA requires that all "[r]esource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans."  16 U.S.C. § 1604(i).  To that effect, the Forest Service's NFMA regulations require that every project and activity must be consistent with the applicable plan components, and it must describe how the project or activity is consistent with those components, including goals, desired conditions, objectives, standards, and guidelines.  36 C.F.R. § 219.15(d).

94.     The Los Padres Forest Plan desired condition for the Mt. Pinos Place Management Area, where the Cuddy Valley Project is proposed, requires it to be maintained as a naturally evolving and naturally appearing landscape that functions as a big tree (old growth) recreation environment, with valued landscape attributes to be preserved over time, including the big tree (old growth) Jeffrey pine forested areas, the natural appearing backdrop to rural communities, and the rustic mountain-built environment.  The Forest Service has failed to describe or explain how the thinning and logging of a significant percentage of the trees in the Cuddy Valley Project area, without diameter limits, will preserve these values.

95.     Moreover, the Forest Service has failed to explain how visual impacts from the removal of a significant percentage of the trees (including large and old-growth trees) and shrubs in the Cuddy Valley Project area will allow the Forest Service to meet the Forest Plan's visual quality objectives and the standard of high scenic integrity for the area, when instead the project will substantially degrade scenic integrity.

96.     By their failure to authorize the Cuddy Valley Project consistent with the Forest Plan (*see* 16 U.S.C. § 1604(i)), Defendants have taken final agency actions that are arbitrary, capricious, and otherwise not in accordance with law, or without observance of procedure required by law, within the meaning of the Administrative Procedure Act.  5 U.S.C. § 706(2).  As such, the Court should hold Defendants' actions as unlawful and set them aside.  *Id.*

## REQUEST FOR RELIEF

97.     For these reasons, Plaintiff requests that the Court:

a)      Declare that the Cuddy Valley Project violates NEPA and NFMA;

b)      Set aside the Cuddy Valley Project decision;

c)      Compel Defendants to supplement their NEPA analysis with an EA or EIS for the Cuddy Valley Project, consider and prepare alternatives to the proposed action, and otherwise order it to comply with NEPA before issuing a new decision;

d)      Compel Defendants to comply with the Forest Plan's requirements for the Mt. Pinos Place Management Area and standard for high scenic integrity;

e)      Enjoin Defendants from felling or removing trees until the Defendants have properly complied with NEPA and NFMA;

f)      Award Plaintiffs their costs of litigation, including reasonable attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

g)      Provide such other relief as the Court deems just and proper.

Respectfully submitted this 29th day of July, 2019.


_____
René Voss


*/s/Douglas P. Carstens* (as authorized 7/26/19)
Douglas P. Carstens
Michelle Black

*Attorneys for Plaintiff*